## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

THOMAS DEZENSKI and
ELIZABETH J. DEZENSKI,

     **Plaintiffs,**

v.

LIVANOVA PLC, SORIN GROUP
DEUTSCHLAND GMBH, and
SORIN GROUP USA, INC.

CIVIL ACTION
No:

JURY TRIAL DEMANDED

---

### CIVIL COMPLAINT

  Plaintiffs, Thomas Dezenski and Elizabeth J. Dezenski, by way of Complaint against

Defendants, LivaNova PLC, Sorin Group Deutschland GMBH and Sorin Group USA, Inc.,

allege as follows:

### JURISDICTION AND VENUE

  1.  This Court has subject matter jurisdiction over this action pursuant to the diverse

citizenship of the parties.  28 USCS § 1332(a)(2).  Decedent was a citizen and resident of the

State of Florida.  Defendant, LivaNova PLC, is a foreign corporation incorporated under the laws

of England and Wales with a corporate headquarters in London.  Defendant, Sorin Group

Deutschland Gmbh, is a foreign corporation headquartered in Munich, Germany.  Defendant,

Sorin Group USA Inc. has a principal place of business in Arvada, Colorado.

2.     Personal jurisdiction exists over Defendants, LivaNova PLC and Sorin Group Deutschland Gmbh, in the U.S. due to the general and specific contacts they maintain in the U.S. Defendants maintain those contacts presently and did so at all times material to this action. The amount in controversy exceeds $75,000.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as a substantial part of the events and/or omissions giving rise to the Plaintiffs' claims emanated from activities within this jurisdiction and Defendants conduct substantial business within this jurisdiction.

## THE PARTIES

4.     Plaintiffs, Thomas Dezenski and Elizabeth J. Dezenski, husband and wife, are adult individuals and citizens of the state of Florida residing at 1742 Sunderland Drive, Port Charlotte, Florida 33980.

5.     Defendant LivaNova PLC ("LivaNova") is a foreign for-profit corporation incorporated under the laws of England and Wales with a headquarters in London. LivaNova is a global medical device company specializing in, among other products, devices used in the treatment of cardiovascular diseases. LivaNova pursuant to an October 2015 merger agreement between Sorin Group S.p.A[1] and non-party, Cybertronics, Inc., advised purchasers in the United States it is the responsible party for the Sorin 3T Heater-Cooler System at issue herein. Further, LivaNova has directly communicated with the Food and Drug Administration ("FDA"), 3T System Customers and other interested parties with respect to safety concerns about the 3T System. *See* the letters attached as Exhibits A through C; Exhibit D, Testimony presented by

---

[1] Upon information and belief, Sorin Group S.p.A. was the original holding company of Defendants, Sorin Group Deutschland Gmbh and Soring Group USA, Inc.

LivaNova officers and employees before the FDA Circulatory Systems Devices Panel for the Medical Devices Advisory Committee on June 2-3, 2016.[2]

6.     Defendant, Sorin Group Deutschland Gmbh ("Sorin") is a foreign for profit corporation headquartered in Munich, Germany. Sorin initially designed, manufactured and marketed the Sorin 3T Heater-Cooler System. In October 2015, Sorin merged with and into LivaNova, with LivaNova continuing as the surviving company.

7.     Defendant, Sorin Group USA, Inc. ("Sorin USA") is a U.S. designer, manufacturer, marketer and distributor of the Sorin 3T Heater-Cooler System, with a principal place of business in Arvada, Colorado. As set forth in LivaNova's Form 10-Q filed with the Security and Exchange Commission, Defendants, Sorin and Sorin USA, are wholly owned subsidiaries of LivaNova. Each Defendant markets and sells products under the LivaNova name.

## GENERAL AND FACTUAL ALLEGATIONS

8.     On or about February 28, 2017 Bayfront Health notified patients who underwent open-heart cardiac surgery had been exposed to a rare and potentially fatal bacteria via Sorin 3T Heater-Cooler Systems used to regulate blood temperature.[3]

9.     The bacterium at issue, *M. Abscessus*, is a subspecies of nontuberculous mycobacterium ("NTM") that occurs naturally in the environment and rarely causes illness. However, NTM poses a unique risk to patients whose organs and chest cavities are directly exposed to the bacteria during surgery.

---

[2] LivaNova regularly does business throughout the U.S. and in Florida.

[3] February 28, 2017 Notification of Risk from Bayfront Health Port Charlotte – Punta Gorda, attached as Exhibit E.

10.     Because NTM is a slow growing bacterium, it generally takes anywhere from two weeks to four years before manifestation of an NTM infection, which most commonly results in pulmonary or cardiovascular disease.

11.     Symptoms of NTM infection are non-specific and may include any of the following: fever, pain, heat or pus around a surgical incision, night sweats, joint and muscle pain, weight loss and fatigue.

12.     The diagnosis of an NTM infection requires targeted culturing and/or molecular diagnostic testing.

13.     While an NTM infection diagnosed early on may be successfully treated with a series of antibiotics, there is a significant risk of death in cases diagnosed late and in individuals with considerably weakened immune systems.

**A.  Defendants' 3T Heater-Cooler Systems as the Infection Source**

14.     The 3T Systems used at UIHC from January 1, 2012 to January 22, 2016 were designed, manufactured, marketed and/or sold by Defendants LivaNova, Sorin and Sorin USA.

15.     The 3T System regulates blood temperature by circulating water through tubes into a heat exchanger where blood is pumped into separate chambers during surgery. The water tanks and other areas where water pass through aerosolize a vapor containing NTM which exits out of the device and is pushed into the ambient air of the operating room through the System's exhaust fan. If placed in the operating room, the contaminated vapor from the System directly enters the sterile surgical field and the patient's open body.



(Taken from LivaNova's presentation to the FDA Circulatory Devices Panel on June 2, 2016, publicly available)

16.    The potential for contaminated water from heater-cooler devices to infect patients intraoperatively was recognized by the medical and scientific community as early as November 2002.[4]

17.    Invasive cardiovascular infections identified as NTM have been reported in Switzerland, Germany and the Netherlands since 2011.[5]

18.    A public health investigation in Switzerland following six patient infections since 2011 included microbiological examinations of environmental samples that identified *M.*

---

[4] *See* The Heater-Cooler Unit—A Conceivable Source of Infection, Weitkemper, *et al.*, The Journal of the American Society of Extra-Corporeal Technology, 2002.

[5] ECDC Rapid Risk Assessment, Invasive Cardiovascular Infection by Mycobacterium Chimaera Potentially Associated with Heater-Cooler Units Used During Cardiac Surgery, April 30, 2015, available online at http://ecdc.europa.eu/en/publications/Publications/mycobacterium-chimaera-infection-associated-with-heater-cooler-units-rapid-risk-assessment-30-April-2015.pdf (last accessed on September 13, 2016).

*Chimaera (a subspecies of NTM similar to M. Abscessus)* contamination in heater-cooler units, including water samples from inside the units. Samples of the ambient air were positive for *M. Chimaera* when the units were running, but negative when they were turned off.[6]

19.     In April 2011 the FDA visited Defendant, Sorin Group Deutschland Gmbh in Munchen, Germany for a plant inspection and to discuss safety concerns with several products, including the 3T System approved in 2005 through the 510(k) process. The FDA advised the company that its 3T Systems harbored dangerous bacteria and that it had failed to make a proper risk assessment for cleaning the devices to avoid bacterial infections in patients exposed in the operating room.

20.     During this inspection, the FDA advised the company that the bacterial growth charts it used to justify the original instruction for device disinfection every 14 days allowed bacterial overgrowth well in excess of safe standards in just one and a half days. The company admitted to the FDA that its cleaning instructions did not meet these standards and that it had no information to support the cleaning methods it disseminated to U.S. purchasers.

21.     On July 15, 2015, Defendants issued a Class 2 Recall of the 3T System because of "[p]otential colonization of organisms, including Mycobacteria, in Sorin Heater Cooler Devices, if proper disinfection and maintenance is not performed per instructions for use."

22.     The recall directed customers to follow the new cleaning and disinfection procedures outlined in a Field Safety Notice issued by LivaNova and/or Sorin on June 15, 2015.

23.     According to this Field Safety Notice, the company's hygiene concept was "enhanced" by introducing the following modifications:

     a.     Use filtered tap water when filling the device;

---

[6] *Id.*

b.      To make disinfection easier, switch from three different cleaning procedures 9every five days, every two weeks and every three months), to just two (every seven days and every fourteen days);

c.      The option to use peracetic acid instead of Clorox for disinfection;

d.      Use hydrogen peroxide in low dose for device preservation;

e.      Include all external tubing, bottles and buckets in the disinfection process;

f.      Change to polyethylene tubing that meets national drinking water standards; and

g.      Unused heater-coolers should be disinfected bi-weekly.

24.     A month prior to the recall, in May 2015, LivaNova and/or Sorin informed customers that devices that had not been maintained according to the manufacturers' instructions for use ("IFUs") for a long period of time required a mechanical deep disinfection process to remove bacterial colonization, referred to as "biofilm."

25.     Upon information and belief, LivaNova and/or Sorin knew or should have known that design and/or manufacturing defects in its 3T System renders it prone to bacterial colonization and transmission, *regardless of the cleaning and disinfection procedures used.*

26.     Manufacturing and User Facility Device Experience ("MAUDE") reports, such as on reported to the FDA on July 7, 2016, evidence that even mechanical deep disinfection followed by the use of filtered water, new water hoses, and three cycles of Defendants' new cleaning procedure fail to eliminate high bacteria counts in the 3T System.[7]

---

[7] *See also*, ECDC Rapid Risk Assessment, *supra* ("In Switzerland, cleaning and decontamination of the heater-cooler units was followed by recontamination. A new

## B. Additional NTM Outbreaks and Regulatory Agency Responses

27.     The risk of NTM transmission with the 3T System is not unique to UIHC. In October and November 2015, two Pennsylvania hospitals notified approximately 3600 patients who underwent open heart surgeries between October 1, 2011 and November 5, 2015 of their exposure to NTM through use of the 3T System. On September 20, 2016, a third Pennsylvania hospital, Penn Presbyterian Medical Center in Philadelphia, announced patient infections linked to the 3T System.

28.     To date, there have been twenty (20) confirmed NTM infections in Pennsylvania which have resulted in five (5) deaths.

29.     Hospitals in at least 14 other U.S. states have reported patient infections and/or device contamination with NTM. For example, in May 2016, Swedish Medical Center in Seattle, Washington issued letters notifying certain cardiac bypass patients that it had tested and found NTM in several of its 3T Systems.

30.     Many hospitals have either discontinued using the 3T System or have moved the System into a separate room to prevent contaminated aerosols from reaching the surgical field.

31.     On October 21, 2015, following the NTM outbreak in Pennsylvania, the U.S. Centers for Disease Control and Prevention ("CDC") issued an Interim Practical Guidance communication to raise awareness among health departments, healthcare facilities and providers of the association between NTM infections and the use of heater-cooler devices.

32.     On December 29, 2015, the FDA sent LivaNova a warning letter advising the company that its 3T Systems were subject to refusal of admission into the U.S. until it resolved

---

heater-cooler unit that initially tested negative for *M. Chimaera* at the hospital tested positive three months after purchase and installation.")

several FDA violations, including the FDA's determination that the 3T Systems were adulterated[8] and misbranded and lacked requisite safety validation for several design changes to both the device itself as well as a series of revised disinfection instructions. The FDA's findings were based on its inspections of the company's Munchen, Germany and Arvada, Colorado production facilities.

33.     In the letter, the FDA identified various design change orders dating back to December 11, 2012 which had never been documented, validated and/or submitted to the FDA for approval.

34.     The letter also identified several changes to the disinfection instructions, dating back to December 20, 2011, which had never been reported to the FDA and which, like the current disinfection instructions, lacked proper efficacy validation.

35.     In April 2016, a Euro Surveillance study following environmental investigations conducted between July 2014 and June 2015 determined that certain 3T Systems manufactured.

36.     A June 1, 2016 FDA Safety Communication following the Euro Surveillance findings noted that "this paper suggests a direct link between the *M. Chimaera* to which European patients were exposed and became infected during open-chest cardiac surgery, and one specific heater-cooler model—the 3T." The FDA cautioned U.S. purchasers of the 3T that if they purchased their units before September 2014 they may have been shipped from Defendants' factory contaminated with *M. Chimaera*.[9]

---

[8] Under the Federal Food, Drug and Cosmetic Act, a medical device is "adulterated" if the methods used in, or the facilities or controls used for their manufacture, packing, storage or installation are not in conformity with current good manufacturing practice requirements of the Quality System regulation.

[9] June 1, 2016 FDA Safety Communication, available at

37.     In June 2016, a study published in the Journal of Emerging Infectious Diseases confirmed the airborne transmission of NTM via 3T Systems due to the ability of the System's exhaust fan to disrupt the ultraclean air ventilation systems of operating rooms. According to the study, aerosolization from the 3T carried *M. Chimaera* particles a distance of up to 5 meters from the device.

38.     On June 2-3, 2016, the FDA hosted a Circulatory System Devices Panel for the Medical Devices Advisory Committee to address the public health risk posed by heater-cooler devices, and in particular, the 3T System.

39.     During this Panel, the FDA noted that nearly 90% of the Medical Device Reports ("MDR") it received between January 2010 and February 2016 citing device contamination and patient infection were attributed to the 3T System.



# MDRs by Manufacturer, Brand Name and User Facility (US vs. OUS)

http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm504213.htm (last accessed on September 20, 2016).

| MDRs by Manufacturer and UF | | | | |
|---|---|---|---|---|
| Manufacturer and Brand Name | Total Number of MDRs | Number of User Facilities Represented in the MDRs | | |
| | | US | OUS | Total |
| LivaNova/Sorin** Stockert 3T | 160 | 15 | 35 | 50 |
| Maquet HCU20, HCU30 & HCU40 | 9 | 0 | 5* | 5* |
| Cincinnati Sub-Zero 333W and Hemotherm | 3 | 2* | 0 | 2* |
| Terumo HX2 | 8 | 1* | 0 | 1* |
| Total | 180 | 16 (2*) | 39 (1*) | 55 (3*) |

*Note that 3 UF reported devices from 2 different manufacturers
**LivaNova/Sorin has approximately 60% of the market share for this type of device

40.     During this Panel, a LivaNova representative admitted that the company was in the process of retrofitting 3T Systems with new design features, including, but not limited to, changing tubing materials from PVC to polyethylene to limit biofilm information and the introduction of plugs in the water circuit to prevent sitting water.

41.     On October 13, 2016, the CDC released the results of genome sequencing studies confirming that patient infections in Pennsylvania and Florida were directly linked to Defendants' Munich, Germany manufacturing site.[10]

42.     That same day, the FDA issued an updated Safety Communication instructing hospitals throughout the country to discontinue using 3T Systems manufactured before September 14, 2016 due to evidence of "point source contamination at the production site."[11]

---

[10] *See* CDC Morbidity and Mortality Weekly Report for October 14, 2016, available online at https://www.cdc.gov/mmwr/volumes/65/wr/mm6540a6.htm?s_cid=mm6540a6_w (last accessed on October 14, 2016).

43.     On November 26, 2011, Thomas Dezenski underwent surgery at UIHC to have a mechanical heart pump known as a left ventricular assist device ("LVAD") placed.

44.     Thomas Dezenski's LVAD was subsequently replaced via surgeries at UIHC on June 5, 2012 and July 20, 2012.

45.     On December 13, 2012, Thomas Dezenski underwent an orthotopic heart transplant at UIHC.

46.     On July 23, 2013, Thomas Dezenski's was admitted for mitral valve replacement, Cox-Maze IV procedure and an intraoperative transesophageal echocardiogram at Bayfront Health. TDezenski2.17

47.     On September 19, 2013, Thomas Dezenski was admitted to Bayfront Health for incision and drainage of two separate foci sternal wounds and placement of the wound VAC device with bridging of single wound VAC device between the two separate sternal wound foci. An infectious disease evaluation yielded a positive blood culture. Thomas Dezenski was discharged home on September 23, 2013 with antibiotics. TDezenski2.12

48.     On October 28, 2013, Thomas Dezenski was re-admitted to Bayfront Health and underwent removal of sternal wires, left pectoralis muscle flap closure, and right pectoralis muscle flap closure. He was discharged from Bayfront Health on November 1, 2013. TDezenski2.9

49.     Thomas Dezenski underwent approximately three (3) months of IV antibiotic treatment and wound VAC treatment. Client's summary

---

[11] *See* October 13, 2016 "UPDATE: Mycobacterium Chimaera Infections Associated with LivaNova PLC (formerly Sorin Group Deutschland GmbH) Stockert 3T Heater-Cooler System: FDA Safety Communication", available online at http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm520191.htm (last accessed on October 14, 2016).

50.     On December 5, 2014, Thomas Dezenski was again re-admitted to Bayfront Health and underwent a second mitral valve replacement due to the a dehiscence of the prosthetic valve with a large paravalvular leak. He was discharged from Bayfront Health on December 13, 2014.

51.     On January 13, 2015, Thomas Dezenski by Dr. Ndubuisi C. Edeoga after Mr. Dezenski developed an infection two weeks following the December 5, 2015 redo mitral valve replacement.  Mr. Dezenski developed a wound dehiscence and drainage on or about January 7, 2015.  An infectious disease evaluation yielded a negative blood culture but the stain is positive for rare acid-fast bacillus.

52.     On March 13, 2015, Thomas Dezenski was admitted at Bayfront Health for sternal debridement with removal of sternal wires. An infectious disease evaluation yielded a negative blood culture.

53.     On or about June 2, 2015, Thomas Dezenski was admitted to Tampa General Hospital for surgical debridement, flap closure and removal of the infected sternum. An infectious disease evaluation yielded a negative blood culture.

54.     On or about February 28, 2017, Thomas Dezenski received a letter from Bayfront Health informing him that he had been exposed to Mycobacterium chimaera via the hospital's heater-cooler devices during open heart surgeries.

55.     On October 3, 2013, Thomas Dezenski's wound cultures returned as positive and he was diagnosed with *M. Abscessus* infection.

56.     As a direct and proximate result of Defendants' negligence and liability producing conduct as described herein, Thomas Dezenski acquired an *M. Abscessus* infection, forcing him to undergo painful medical procedures and treatment.

13

57.    As a direct and proximate result of Defendants' negligence and liability producing conduct as described herein, Plaintiffs, Thomas and Elizabeth J. Dezenski, have expended and will continue to expend various sums of money for medical care and treatment.

58.    As a direct and proximate result of Defendants' negligence and liability producing conduct as described herein, Plaintiff, Thomas Dezenski, suffered and continues to suffer from excruciating and agonizing physical and emotional pain and suffering.

59.    As a further direct and proximate result of Defendants' negligence and liability producing conduct as described herein, Plaintiff, Elizabeth J. Dezenski, was and will continue to be deprived of the care, comfort, companionship, services and consortium of her husband, Thomas Dezenski.

60.    Plaintiff, Thomas Dezenski, was in no way responsible for his injuries

## COUNT I
## Negligence – Design Defect

61.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

62.    The 3T System is a product within the meaning of Florida products liability law.

63.    The 3T System was expected to reach, and did reach, users and/or consumers, including Plaintiff Thomas Dezenski, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

64.    Under Florida products liability law, Defendants, LivaNova, Sorin and Sorin U.S.A, owed Plaintiff Thomas Dezenski, a duty to exercise reasonable care in designing and testing the 3T System.

65.     Defendants, LivaNova, Sorin and Sorin U.S.A. designed the 3T System for the purpose of heating and cooling patient blood during major heart, lung and liver surgeries.

66.     At all times material, the 3T System was used in a manner intended and/or foreseeable to the Defendants.

67.     A patient or consumer using the 3T System would reasonably expect the device to be free of significant defects.

68.     The 3T System, as designed by the Defendants, colonizes bacteria, including *M. Abscessus*.

69.     The 3T System, as designed by the Defendants, directly transmits bacteria, including *M. Abscessus,* to patients during invasive surgery.

70.     The foreseeable risks of using the 3T System, particularly severe bacterial infection and/or death, significantly outweigh the benefits conferred upon patients using the 3T System.

71.     Reasonable alternative designs existed for the 3T System which would have eliminated or reduced the risk of bacterial colonization and/or transmission of such bacteria to patients undergoing invasive surgical procedures.

72.     Reasonable and feasible alternative designs include, but are not limited to, measures to direct airflow away from the surgical field (i.e. a housing unit for the exhaust vent), reducing the force at which air is vented from the System to a rate of less than 1000 cubic feet per minute, water reservoir isolation by using closed loop fluid management, an open water design to prevent inaccessible airspace, removable lids and parts for easy disinfection, disposable tank liners to prevent biofilm formation, and internal pasteurization or UV features to kill bacteria.

73.    The failure to use feasible, reasonable alternative designs that eliminate bacterial colonization and the aerosolization of bacteria into the ambient air of operating rooms renders the 3T System unreasonably unsafe.

74.    Defendants knew or should have known as early as 2002 that NTM, or other harmful bacteria, could colonize within the 3T System and be spread to patients during surgery through the exhaust vent.

75.    Plaintiff Thomas Dezenski's *M. Abscessus* infection was caused by Defendants' According to this Field Safety Notice, the company's hygiene concept was "enhanced" by introducing the following modifications:

      a.    Failing to conduct adequate safety and efficacy testing before placing the 3T System into the stream of commerce;

      b.    Failing to timely establish procedures for reviewing the design of the 3T System after receiving information that patients were developing bacterial infections as a result of surgeries using the System;

      c.    Failing to timely establish procedures for validation or, where appropriate, review and approval of design change orders for the 3T System before their implementation as required under 21 CFR 820.30(i); and

      d.    Failing to design or redesign the 3T System to eliminate or mitigate bacterial colonization and/or transmission of such bacteria.

76.    Plaintiff, Thomas Dezenski, was proximately harmed by the aforesaid design defects in the 3T System as described above.

WHEREFORE, Plaintiffs, Thomas and Elizabeth J. Dezenski, demand judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Florida, together with interest thereon, costs of suit and attorneys' fees.

## COUNT II
### Strict Liability-Manufacturing Defect

77.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

78.     The 3T System is a product within the meaning of Florida products liability law.

79.     The 3T System was expected to reach, and did reach, users and/or consumers, including Plaintiff Thomas Dezenski, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

80.     Defendants, LivaNova, Sorin and Sorin U.S.A. manufactured the 3T System for the purpose of heating and cooling patient blood during major heart, lung and liver surgeries.

81.     At all times material, the 3T System was used in a manner intended and/or foreseeable to the Defendants.

82.     A reasonable patient or consumer of the 3T System would expect that the device be free of significant defects.

83.     The 3T System, as manufactured by the Defendants, colonizes bacteria, including *M. Abscessus*.

84.     The 3T System, as manufactured by the Defendants, directly transmits bacteria, including *M. Abscessus,* to patients during invasive surgery.

85.     The foreseeable risks of using the 3T System, particularly severe bacterial infection and/or death, significantly outweigh the benefits conferred upon patients using the 3T System.

86.     Plaintiff Thomas Dezenski *M. Abscessus* infection was caused by the following manufacturing defects:

a.      Failing to timely establish procedures or practices to prevent the 3T System from being contaminated with NTM on the production line or elsewhere at Defendants' production facilities;

b.      Manufacturing and selling the 3T System with NTM contamination that occurred on the production line or elsewhere at Defendants' production facilities; and

c.      Failing to ensure proper workmanship, materials and labeling for the 3T System.

87.     Plaintiff, Thomas Dezenski, was proximately harmed by the aforesaid manufacturing defects in the 3T System as described above.

WHEREFORE, Plaintiffs, Thomas and Elizabeth J. Desenski, demand judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Florida, together with interest thereon, costs of suit and attorneys' fees.

## COUNT III
## Negligence – Warnings Defect

88.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

18

89.     The 3T System is a product within the meaning of Florida products liability law.

90.     The 3T System was expected to reach, and did reach, users and/or consumers, including Plaintiff, Thomas Dezenski, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

91.     Defendants, LivaNova, Sorin and Sorin U.S.A, owed Plaintiff, Thomas Dezenski, a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling the 3T System.

92.     Defendants, LivaNova, Sorin and Sorin U.S.A. marketed, advertised and promoted the 3T System for the purpose of heating and cooling patient blood during major heart, lung and liver surgeries.

93.     At all times material, the 3T System was used in a manner intended and/or foreseeable to the Defendants.

94.     A reasonable patient or consumer of the 3T System would expect that the device be free of significant defects.

95.     The 3T System colonizes bacteria, including *M. Abscessus*, and directly transmits such bacteria to patients during invasive surgery.

96.     Defendants knew or should have known as early as 2002 that NTM, or other harmful bacteria, could colonize within the 3T System and be spread to patients during surgery through the exhaust vent.

97.     The foreseeable risks of using the 3T System, particularly severe bacterial infection and/or death, significantly outweigh the benefits conferred upon patients using the 3T System.

98.     Plaintiff Thomas Dezenski's *M. Abscessus* infection was caused by Defendants' conduct as follows:

> a.      Failing to provide proper cleaning and disinfection procedures for the 3T System;
>
> b.      Failing to conduct proper validation studies to demonstrate the safety and efficacy of cleaning and disinfection procedures for the 3T System;
>
> c.      Failing to warn patients like Thomas Dezenski and/or purchasers of the 3T System that the system colonized bacteria and unnecessarily transmitted it into the ambient air of operating rooms;
>
> d.      Failing to timely notify known purchasers of the 3T System that patients could be exposed to *M. Abscessus*;
>
> e.      Failing to alert hospitals and patients to promptly test for NTM infection when patients present with fever, pain, heat or pus around a surgical incision, night sweats, join and muscle pain, weight loss and fatigue after surgery using the 3T System; and
>
> f.      Failing to timely notify known purchasers of the 3T System to relocate the device from the operating room during surgery to prevent patient transmission of NTM.

99.     Plaintiff, Thomas Dezenski, was proximately harmed by the aforesaid warnings defects in the 3T System as described above.

WHEREFORE, Plaintiffs, Thomas and Elizabeth J. Dezenski, demand judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such

damages as may be permitted pursuant to the laws of the State of Florida, together with interest thereon, costs of suit and attorneys' fees.

## COUNT IV
### Loss of Spousal Consortium

100.    Plaintiff incorporates by reference the preceding paragraphs as if sully set forth herein.

101.    Plaintiff, Elizabeth J. Dezenski, is entitled to the care, comfort, companionship, services and consortium of her husband, Thomas Dezenski.

102.    As a result of the aforesaid injuries sustained by Thomas Dezenski, Plaintiff, Elizabeth J. Dezenski has been and will continue to be deprived of the care, companionship, services and consortium of her husband.

WHEREFORE, Plaintiff, Elizabeth J. Dezenski, demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Florida, together with interest thereon, costs of suit and attorneys' fees.

## COUNT V
### PRAYER FOR RELIEF

Plaintiffs, Thomas and Elizabeth J. Dezenski, request the Court to enter judgment against the Defendants as follows:

   A.   An award to Plaintiffs of compensatory and punitive damages, costs and reasonable attorneys' fees, as permitted by law;

   B.   An award of pre-judgment and post-judgment interest, as provided by law;

C.  Leave to amend this Complaint to conform to the evidence produced at trial;
and

D.  Such other relief as may be appropriate under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: June 12, 2017

Kimberly Adams
Florida Bar No. 0014479
Wesley Bowden
Florida Bar No. 0064217
LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY & PROCTOR, P.A.
316 South Baylen St.
Pensacola, FL 32502
Telephone:(850) 435-7184
Email: kadams@levinlaw.com
Email: wbowden@levinlaw.com